UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

ARGENTINA VALET,

        Plaintiff,

                               **NOT FOR PUBLICATION**

    -against-

                               <u>**MEMORANDUM & ORDER**</u>

MICHAEL J. ASTRUE,                10-CV-3282 (KAM)

Commissioner of Social Security,

        Defendant.

----------------------------------------X

**MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. § 405(g), plaintiff Argentina

Valet ("plaintiff") appeals the final decision of defendant

Commissioner of Social Security Michael Astrue ("defendant" or

the "Commissioner") denying plaintiff's application for Social

Security Disability Insurance Benefits ("SSD") under Title II of

the Social Security Act (the "Act"), from August 17, 2002 to

March 31, 2003, the date last insured.[1]  Plaintiff, who is

represented by counsel, contends that she is "disabled and

unable to work . . . [due to] osteoarthritis, migraines,

cervical and lumbar radiculopathies and fibromyalgia," which

---

[1] Individuals may seek judicial review in the United States district court for
the judicial district in which they reside of any final decision of the
Commissioner of Social Security rendered after a hearing to which they were a
party, within sixty days after notice of such decision or within such further
time as the Commissioner may allow.  *See* 42 U.S.C. § 405(g).

impairments have prevented her from obtaining gainful employment since August 17, 2002.  (*See* ECF No. 1, Complaint, dated 07/19/2010 ("Compl.") ¶¶ 4-5.)  Presently before the court are the parties' cross-motions for judgment on the pleadings.  For the reasons set forth below, the cross-motions are denied and the case is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

## I.  Plaintiff's Personal and Employment History

Plaintiff was born on August 17, 1952 in the Dominican Republic.  (ECF Nos. 17 & 18, Administrative Transcript, filed 2/28/2011 ("Tr."), at 150, 613, 726.)  After graduating from high school in 1969, plaintiff immigrated to the United States and she subsequently became an American citizen.  (*Id.* at 626, 168, 726.)  In 1970, plaintiff married Juan F. Valet in the Dominican Republic.  (*Id.* at 150.)  Plaintiff testified that the couple has six children.[2]  (*Id.* at 732.)

From September 1978 to January 1995, plaintiff was employed as a hand packer at the Stanley Paper Company, where she operated a machine that made vacuum bags and "packed the paper into a box coming off of a machine." (*Id.* at 162, 177, 179, 628-29.)  According to plaintiff's testimony before the

---

[2] According to the Administrative Record, plaintiff has two children under the age of 18.  (See Tr. at 150-51.)

Administrative Law Judge ("ALJ"), plaintiff lifted boxes weighing between 10 and 20 pounds daily.[3] (*Id.* at 629.) In addition to working at the factory, between 1989 and 1991, plaintiff worked weekends at a beauty parlor styling and cutting hair. (*Id.* at 727, 736.)

From September 1996 to May 1998, plaintiff was employed at Golden Mark Industries and cleaned medical offices. (*Id.* at 162, 177-78.) As a cleaner, plaintiff mopped, cleaned, vacuumed and took out the garbage. (*Id.* at 178, 628.) Plaintiff testified that she lifted "maybe ten pounds" at work and mainly stood and walked during the workday. (*Id.* at 628.)[4] Plaintiff further testified that she has not worked since 1998. (*Id.* at 682.) Plaintiff stated that she stopped working in 1998 because she "[couldn't] get to the vacuum," due to pain in her left side, pain in her shoulder, and headaches. (*Id.* at 728.) Additionally, plaintiff testified that her lower back and knee bothered her. (*Id.* at 729.)

On June 6, 2005, plaintiff testified before ALJ Dennis O'Leary ("ALJ O'Leary") that she lived at home with her husband and three of her daughters. (*Id.* at 732-33.) Plaintiff further reported that she cooked for 30 minutes to an hour, but not

---

[3] Plaintiff noted on her work history report that she frequently lifted between 25 and 50 pounds. (Tr. at 179.)

[4] Plaintiff noted on her work history report that she frequently lifted 25 pounds during the workday. (Tr. at 178.)

every day.  (*Id.* at 733.)  Plaintiff's daughters did the laundry and her husband did the grocery shopping.  (*Id.* at 733-34.) Plaintiff further testified that she could stand for 30 minutes before she felt pain and had to sit down again.  (*Id.* at 734.) Plaintiff testified, however, that she sometimes walked ten blocks to her daughter's school and sometimes walked to the store from her house.  (*Id.* at 735, 738.)

## II.   Plaintiff's Medical History

### A. Report of Eric S. Lippman, M.D.

Eric S. Lippman, M.D. ("Dr. Lippman") first saw plaintiff on March 8, 2000 and reported that she had "an approximately 4-5 year history of low back pain which radiated to the left lower extremity without complaints of paresthesias[5] or weakness."  (*Id.* at 389.)  Upon examination, Dr. Lippman observed that plaintiff's straight leg raise was negative bilaterally and she had tight hamstrings and pain with flexion of the lumbosacral spine.  (*Id.* at 285.)  He also noted that plaintiff was "able to heel walk and toe walk easily" and had "full range of motion of the hips, knees and ankles."  (*Id.*) Dr. Lippman diagnosed low back pain and lumbosacral radiculitis[6]

---

[5] The term "paresthesia" refers to "an abnormal sensation of the skin, such as numbness, tingling, pricking, burning, or creeping on the skin that has no objective cause."  Definition of Paresthesia, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=4780 (last visited Jan. 20, 2012).

[6] The term "radiculitis" or "radiculopathy" refers to a "a condition due to a compressed nerve in the spine that can cause pain, numbness, tingling, or

and prescribed Flexeril and a rehabilitation program. (*Id.*) Although plaintiff "did not have complete resolution," she responded "with a moderation of her symptoms to the therapy at the time." (*Id.* at 389.)

On June 12, 2000, Charles J. DeMarco, M.D. ("Dr. DeMarco") reported on an MRI of plaintiff's lumbar spine ordered by Dr. Lippman. (*Id.* at 328.) Dr. DeMarco found posterior disc bulging of the L4-5 intervertebral disc and moderate disc degeneration at L5-S1 with a narrowing of the right lateral neural foramen. (*Id.*) Dr. DeMarco also noted that the conus medullaris and cuada equina were "normal in position and appearance." (*Id.*)

In a left knee MRI report dated August 24, 2000, Howard J. Gelber, M.D. ("Dr. Gelber") reported to Dr. Lippman that plaintiff had a palpable lump and "pain posteriorly and laterally in the left knee." (*Id.* at 327.) Dr. Gelber found that there was a "Grade II signal [in the] posterior horn of the medial meniscus without evidence of [a] superimposed tear" and that "no . . . abnormality [was] evident in the area of the oil-filled marker." (*Id.*) Additionally, Dr. Gelber found that "the anterior and posterior cruciate ligaments, medial and lateral

---

weakness along the course of the nerve." The most common location of radiculopathy is in the lower back and neck. Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (last visited Jan. 20, 2012).

collateral ligaments, and patellar and quadriceps tendons appear[ed] unremarkable." (*Id.*)

On July 23, 2001, plaintiff went to Dr. Lippman complaining of recurring neck, back, and left knee pain. (*Id.* at 389, 343.) Plaintiff told the doctor that "movement increased her pain and rest reduced her pain." (*Id.*) The doctor noted "some radiation to the left upper extremity with paresthesias with possible left upper extremity weakness." (*Id.*) Dr. Lippman also noted "bilateral cervical and trapezius tenderness, left shoulder tenderness, bilateral lumbosacral tenderness, tight hamstrings and pain with flexion but no pain with extension." (*Id.*) Dr. Lippman prescribed plaintiff Celebrex, Flexeril, and physical therapy. (*Id.* at 389, 344.)

Plaintiff next saw Dr. Lippman on December 16, 2002 complaining of neck, back, and knee pain. (*Id.* at 389, 347-48.) Additionally, plaintiff complained that "her pain was increasing with sitting and sitting in one position for a long period of time." (*Id.* at 389.) Dr. Lippman noted that plaintiff had "some paresthesias on the left side [and her] back pain was radiating down the left lower extremity." (*Id.*) Dr. Lippman's examination revealed a "reduced cervical range of motion, left trapezius and periscapular tenderness and trigger points, right and left lumbosacral tenderness and left knee posterior tenderness." (*Id.* at 389, 348.) He also noted that plaintiff

was "able to heel/toe" walk, her flexion was ok, and sensation was intact. (*Id.* at 347-48.)[7]

Plaintiff saw Dr. Lippman three more times between January 15, 2003 and February 13, 2003, with no significant changes noted by the doctor. (*See id.* at 349-51.) On February 26, 2003, plaintiff followed up with Dr. Lippman after physical therapy and reported that her left knee was "75% improved," but that "she had no changes in her neck pain." (*Id.* at 390, 352.)

On January 4, 2005, Dr. Lippman performed an EMG[8] and nerve conduction studies on plaintiff. (*Id.* at 383-87.) The nerve studies were "normal for latency, amplitude and nerve conduction velocity." (*Id.* at 384.) The EMG study revealed "fibrillation potentials in the left 1st [dorsal interossei] muscle." (*Id.* at 384; *see also id.* at 617.) A concurrent physical examination showed no atrophy or weakness. (*Id.* at 387.) Dr. Lippman found that plaintiff had a "left C8-T1

---

[7] The court notes that the record contains additional records from Franklin Hospital Medical Center, which show that in December 2002, plaintiff was given a blood transfusion, and in January 2003 and November 2004, plaintiff underwent dilation and curettage. (*See* Tr. at 295-312, 360-373.) The pathology report was within normal limits, (*id.* at 364), and this condition does not appear to relate to or have any bearing on the impairments on which plaintiff's claims for SSD are based.

[8] An electromyogram (EMG) is a test used to record the electrical activity of muscles. Electromyogram (EMG), MedicineNet.com, http://www.medicinenet.com/electromyogram/article.htm (last visited Jan. 20, 2012).

radiculopathy," and he suggested an MRI of plaintiff's cervical spine.[9] (*Id.* at 384, 387.)

Plaintiff's final visit to Dr. Lippman occurred on March 28, 2005, where she complained of weakness and "leftsided neck pain radiating to the left upper extremity." (*Id.* at 390, 496.) Plaintiff reported that she became dizzy and had increased pain with cervical range of motion. (*Id.*) Dr. Lippman's physical examination revealed, *inter alia*, a "reduced rightward rotation to 20 [degrees]" and left-sided neck tenderness. (*Id.* at 390.) An x-ray of plaintiff's shoulder showed "some mild degenerative changes." (*Id.* at 390, 496.) Plaintiff's leftward rotation, flexion and extension, however, were normal, she had full range of motion in her shoulders, elbows, wrists, and hands, and her tone, coordination, gait, and balance were normal. (*Id.* at 496.) The doctor found no signs of impingement. (*Id.*) Further, plaintiff's strength was 5/5 in all major muscle groups and her bilateral sensation was intact. (*Id.*) Dr. Lippman prescribed plaintiff Tylenol, physical therapy, and a home exercise program, which he hoped would "restore her normal level of function." (*Id.* at 390, 496.)

Dr. Lippman's final diagnosis of plaintiff, given in his May 26, 2005, narrative report, stated:

---

[9] There is no evidence in the record that an MRI of the cervical spine was performed.

Ms. Valet has had intermittent recurrent pain in the neck, knee and back, more focused recently on the neck which radiates to the left upper extremity, accompanied by some weakness and radicular symptoms. This is continuing and continues to cause her pain and disability. This is limiting her ability to perform her daily activities and work at a sustained fulltime basis.

(*Id.* at 390.)

### B. Report of Stuart D. Kaplan, M.D.

Stuart D. Kaplan, M.D. ("Dr. Kaplan") first met plaintiff on June 23, 1999, for a rheumatologic consultation after she complained of pain and tingling in her hands and feet. (*Id.* at 391, 470.) On physical examination, Dr. Kaplan found "multiple tender points as well as some tender lymph nodes in the neck and positive Tinel signs in both wrists." (*Id.*) Plaintiff was diagnosed with a "fibromyalgia-type of syndrome," which may have been caused by a viral infection, as well as "some carpal tunnel syndrome." (*Id.* at 391.) Dr. Kaplan treated plaintiff with a short course of steroids and Flexeril. (*Id.*)

After a follow-up appointment on July 7, 1999, Dr. Kaplan indicated that plaintiff had "some shingles on her left flank in addition to a tender cervical node and multiple tender points." (*Id.* at 391, 462.) Dr. Kaplan gave plaintiff an intramuscular injection of Toradol and prescribed Elavil. (*Id.*)

Dr. Kaplan next saw plaintiff on February 7, 2000, when she came in complaining of "some aches in her hands and feet and also . . . a sore throat." (*Id.* at 391, 461.) A physical examination revealed "mild tenderness across the lumbar spine but no swelling or synovitis of the joints." (*Id.*) Dr. Kaplan found that plaintiff had "an upper respiratory infection with related arthralgias." (*Id.*) Plaintiff was treated with Zithromax, Tylenol, and Flexeril. (*Id.*) At a follow-up appointment on February 21, 2000, plaintiff complained that her back was still hurting and Dr. Kaplan prescribed Vioxx. (*Id.*)

Plaintiff had two follow-up visits with Dr. Kaplan, on June 5, 2000 and July 3, 2000, respectively. (*See id.* at 392, 451, 449.) Plaintiff complained of lower back pain that radiated to her legs and reported that she was having trouble walking. (*Id.*) Dr. Kaplan's physical examination revealed "some tenderness over the lateral aspect of the hips and diffuse tenderness and spasm across the lumbar region." (*Id.* at 392.) Dr. Kaplan gave plaintiff Ultram for pain control and directed her to continue with physical therapy. (*Id.*)

Dr. Kaplan next saw plaintiff on October 18, 2000, at which time she complained of "diffuse musculoskeletal pain" and pain radiating down her left leg. (*Id.* at 392, 448.) A physical examination revealed multiple tender points and Dr. Kaplan diagnosed plaintiff with "fibromyalgia, osteoarthritis

and lumbosacral radiculopathy." (*Id.*) Dr. Kaplan prescribed Paxil, Flexeril, and Celebrex. (*Id.*) At a subsequent appointment on July 16, 2001, Dr. Kaplan again opined that plaintiff had "fibromyalgia and lumbosacral radiculopathy," adding Skelaxin to her medications. (*Id.* at 392, 444.) On November 19, 2001, plaintiff complained to Dr. Kaplan that the Skelaxin made her sleepy, and he recommended that she increase her physical therapy and consider epidural injections. (*Id.* at 392, 443.)

On December 4, 2002, plaintiff saw Dr. Kaplan with complaints of left knee and neck pain. (*Id.* at 392, 440.) A physical examination revealed "some posterior spasm and tenderness of the neck and some crepitation and tenderness in the left knee as well as the usual lumbar spasm." (*Id.*) An x-ray of plaintiff's cervical spine showed "slight degenerative changes at the posterior aspects of C4 through C7," while a knee x-ray revealed "mild degenerative joint disease." (*Id.*) Dr. Kaplan prescribed Vioxx and Skelaxin and referred plaintiff for physical therapy. (*Id.*)

On four subsequent visits to Dr. Kaplan between April 2, 2003 and May 5, 2004, plaintiff complained of pain in her left hip, neck, and left knee, along with pain and numbness in her hands. (*See id.* at 392-93, 439.) Plaintiff also noted, "she could not stand for any prolonged period of time." (*Id.* at

392.)  Dr. Kaplan found that plaintiff had "trochanteric bursitis of the hip in addition to her underlying osteoarthritis and fibromyalgia."  (*Id.* at 392.)

In plaintiff's final three visits to Dr. Kaplan between December 23, 2004 and April 29, 2005, she continued to complain of shoulder and neck pain, along with numbness in her hands.  (*See id*. at 393.)  Plaintiff noted that although "the injection in [her] left shoulder had helped for a while . . . the shoulder pain was returning."  (*Id.*)  Dr. Kaplan found positive Tinel signs, "rotation of the neck limited to 80 [degrees] in each direction," and crepitation in the left shoulder and both knees.  (*Id.*)

In a letter to plaintiff's counsel dated June 1, 2005, Dr. Kaplan stated that he had treated plaintiff over the course of six years for "rheumatologic problems including osteoarthritis, lumbosacral and cervical radiculopathies, carpal tunnel syndrome and fibromyalgia syndrome."  (*Id.*)  Dr. Kaplan concluded that plaintiff's functional capacity was "very limited and she is unable to perform any activities requiring prolonged standing, walking, sitting or repetitive use of her arms or hands." (*Id.*)  In his opinion, plaintiff was "totally disabled and not capable in engaging in any meaningful employment."  (*Id.* at 394.)

## C. Report of David Steiner, M.D.

On January 13, 2005, at the request of Dr. Kaplan, plaintiff saw a neurologist, David Steiner, M.D. ("Dr. Steiner"), regarding her "near daily" headaches. (*See id.* at 498-99.) Upon physical examination, Dr. Steiner noted that plaintiff's cervical spine had "increased tone with pain to palpation and decreased [range of motion] to flexion, extension and lateral rotation." (*Id.* at 500.) Her lumbar spine, however, had normal range of motion and no pain to palpation. (*Id.*) In a test of plaintiff's motor strength, Dr. Steiner found she had "4+/5 left elbow extension and left shoulder abduction, [with] all else grossly 5/5 strength . . . with normal tone and no atrophy." (*Id.* at 501.) Her sensation was intact to light touch and she could ambulate independently. (*Id.*) Dr. Steiner diagnosed plaintiff with migraines without aura, cervical radiculopathy, cervicalgia, and chronic daily headaches. (*Id.*) He recommended continued physical therapy and suggested acupuncture for neck pain and other medications for plaintiff's headaches. (*Id.*)

## D. Report of James E. Henry, D.O.

On May 18, 2007, plaintiff saw James E. Henry, D.O. ("Dr. Henry"). Plaintiff's chief complaint was "longstanding low back and neck pain since 1999." (*Id.* at 586.) At the time, the only medication plaintiff reported using was Tylenol. (*Id.*)

Dr. Henry reviewed imaging results of plaintiff's spine, which showed "mild degenerative changes" to plaintiff's cervical spine and "significant facet degeneration . . . with decreased space" with respect to plaintiff's lumbar spine. (*Id.*) He diagnosed plaintiff with "arthritis with degenerative disc disease at the lumbar spine without lower radicular symptoms, mechanical back pain, and cervical mild degenerative arthritis." (*Id.* at 587.) He suggested physiotherapy, weight loss, and anti-inflammatories. (*Id.*)

### E. Report of Robert Zaretsky, M.D.

On October 15, 2007, Robert Zaretsky, M.D. ("Dr. Zaretsky") performed an orthopedic consultation for plaintiff. (*Id.* at 425.) At the time of plaintiff's visit to Dr. Zaretsky, she complained of lower back pain that radiated to her left leg, muscle soreness, and headaches. (*Id.*) Plaintiff told the doctor that she had "the capacity to walk about 3 blocks very slowly . . . [could] stand for 15 minutes, sit 20 minutes and lift and carry approximately 15-20 pounds, depending on the day." (*Id.* at 426.)

Upon physical examination, Dr. Zaretsky found "tenderness across the trapezius muscles bilaterally" and noted that plaintiff's "neck flexion was restricted to 40 [degrees], extension 40 [degrees], [and] rotation 40 [degrees] to the right and left." (*Id.*) An examination of plaintiff's lumbar region

revealed that her "trunk flexion was 40 [degrees], extension 10 [degrees] and lateral bend 10 [degrees] to the left and right." (*Id.*)  Plaintiff's leg raise was negative but there was a "1.5 [inch] atrophy of the left calf."  (*Id.*)  Dr. Zaretsky opined that plaintiff had been disabled since 1998 through the date of the examination.  (*Id.*)  He concluded that plaintiff had "limited capacity for sitting, standing, walking, lifting and carrying," and recommended that she continue taking her medication and seeking physical therapy.  (*Id.*)

### F. Physicians' Multiple Impairments Questionnaires

Dr. Kaplan and Dr. Zaretsky each completed a multiple impairments questionnaire regarding plaintiff's medical condition.  (*See id.* at 395-402, 427-34.)  Dr. Kaplan noted on his questionnaire that "if [his] patient were placed in a normal COMPETITIVE FIVE DAY A WEEK WORK ENVIRONMENT ON A SUSTAINED BASIS," she could sit for three hours and stand or walk for less than one hour.  (*Id.* at 397.)  He also estimated that plaintiff's level of pain was "moderately severe."  (*Id.*)[10]  Dr. Kaplan stated that plaintiff could occasionally lift up to ten pounds and carry up to five pounds.  (*Id.* at 398.)  Dr. Kaplan also noted that plaintiff was limited in doing repetitive reaching, handling, fingering, or lifting because of her

---

[10] Dr. Kaplan circled 8 out of 10 on his questionnaire, which corresponds to a pain level of moderately severe.  (Tr. at 397.)

"cervical radiculopathy and symptoms of carpal tunnel syndrome."
(*Id.* at 398-99.)   Finally, Dr. Kaplan reported that plaintiff
was only capable of low stress work because stress worsened her
fibromyalgia and that all of her symptoms combined would likely
cause plaintiff to miss work more than three times a month.
(*Id.* at 400, 401.)

Dr. Zaretsky noted on his questionnaire that "if [his]
patient were placed in a normal COMPETITIVE FIVE DAY A WEEK WORK
ENVIRONMENT ON A SUSTAINED BASIS," she could sit for two hours a
day and stand or walk for one hour per day.   (*Id.* at 429.)   He
further noted that plaintiff's level of pain was "moderately
severe."   (*Id.*)[11]   Dr. Zaretsky also estimated that plaintiff
could occasionally lift or carry ten to fifteen pounds.   (*Id.* at
430.)   Finally, Dr. Zaretsky reported that plaintiff was only
capable of low stress work because stress had an adverse effect
on her fibromyalgia and that she would have to miss work more
than three times a month.   (*Id.* at 432, 433.)

**III.   Expert Testimony**

**A. Expert Testimony of Bernard Gussoff, M.D.**

On August 7, 2008, Bernard Gussoff, M.D. ("Dr.
Gussoff"), a board certified doctor in internal medicine with a
subspecialty in hematology and oncology, testified as a medical

---

[11] Dr. Zaretsky circled 7-8 out of 10 on his questionnaire, which corresponds
to a pain level of moderately severe.   (Tr. at 429.)

expert at a hearing before Administrative Law Judge Hazel
Strauss ("ALJ Strauss").  (*See id.* at 682, 122.)  Dr. Gussoff
opined that plaintiff had "two out of the three [requirements]
which would not meet, but would be an equivalent" to Medical
Listing 1.04A.  (*Id.* at 696.)  Specifically, he stated that
although plaintiff did not have spinal stenosis, atrophy, or a
positive straight leg raising test, (*id.* at 699, 707, 708), she
did have "encroachment on the neural foramina, nerve root
impingements, and . . . a herniated disc," which, "combined with
her complaints and with the reports of the doctors to indicate
there was good and sufficient evidence that she was
incapacitated in that area."  (*Id.* at 695-96.)  Dr. Gussoff
opined that an individual with encroachment of the nerve root
and severe pain has a sufficient reason to be compromised in
function.  (*Id.* at 701.)

**B. Expert Testimony of Edward Spindell, M.D.**

At a supplemental hearing before ALJ Strauss on
October 14, 2008, Edward Spindell, M.D. ("Dr. Spindell"), an
orthopedic surgeon, testified that plaintiff did not have an
impairment that met or equaled the severity of Medical Listing
1.04.  (*See id.* at 632, 641, 142.)  Dr. Spindell testified that
the June 2000 MRI of plaintiff's lumbosacral spine, which showed
"some degenerative changes with a disc herniation encroaching
upon the right neural foramina," was not significant to

plaintiff's complaints of left leg pain because the findings of
the MRI were all on plaintiff's asymptomatic right side.  (*Id.*
at 636-37, 645.)  Dr. Spindell also noted that the deficit
revealed by the January 4, 2005 EMG study of plaintiff's
cervical spine related only to the left first finger, and not to
the entire hand, and the clinical findings related to the EMG
study were "within normal limits," with "no sensory deficit, no
motor deficit, motion was complete, [and] strength was normal."
(*Id.* at 637, 639-40.)  In light of these normal clinical
findings, Dr. Spindell stated that the EMG results bore less
significance.  (*Id.* at 638.)  Dr. Spindell further stated that
"there was nothing that showed an acute neurological deficit
involving motor strength[,] . . . there were no neurological
deficits and . . . the findings showed no gross deformity."
(*Id.* at 642.)  Dr. Spindell believed that plaintiff could sit
and walk for six hours, climb stairs two to four times a day,
occasionally squat, and occasionally kneel.  (*Id.* at 651-53.)
Finally, Dr. Spindell noted that the record lacked a definite
diagnosis of fibromyalgia or multiple trigger points.  (*Id.* at
654.)

### C. Testimony of Vocational Expert Julie Andrews

Julie Andrews ("Ms. Andrews"), a vocational expert,
testified before ALJ Strauss at the October 14, 2008
supplemental hearing.  (*Id.* at 664.)  Ms. Andrews was asked to

testify about the type of employment an individual could obtain if he or she was of the same age, education and past relevant work as plaintiff, could lift and carry 20 pounds occasionally and ten pounds frequently, and could sit six out of eight hours and stand and walk six out of eight hours. (*Id.* at 667-68.) Ms. Andrews testified that plaintiff could perform her past work as a hand packager as she had actually performed the job. (*Id.*) Additionally, Ms. Andrews testified that an individual with the residual functional capacity described above could be an information clerk or a surveillance system monitor. (*Id.* at 672.)

## IV.    Procedural History

On February 21, 2003, plaintiff applied for SSD benefits, alleging disability since June 9, 1999.[12] (*Id.* at 150.) The Commissioner denied plaintiff's claim on April 30, 2003. (*Id.* at 54.) On May 23, 2003, plaintiff requested a hearing before an Administrative Law Judge. (*Id.* at 59.) Her request was granted, and the hearing took place on June 6, 2005 before ALJ Dennis O'Leary, at which time plaintiff testified and was represented by counsel. (*See id.* at 721-40.)

On August 16, 2005, ALJ O'Leary issued a decision denying plaintiff's claims that she was entitled to Social

---

[12] At the hearing before ALJ Dennis O'Leary on June 6, 2005, plaintiff amended her onset date to August 17, 2002. (Tr. at 725.) This was the date that she turned 50 years old. (*Id.* at 719.)

Security Disability Insurance Benefits. (*Id.* at 53.) ALJ
O'Leary found that plaintiff's impairments did not meet or equal
Medical Listing 1.04A, that plaintiff's complaints were not
totally credible, and that plaintiff was not under a disability
as defined by the Social Security Act. (*Id.* at 52-53.)
Plaintiff requested, and on September 9, 2005 was granted, a
review of ALJ O'Leary's decision under the error of law
provision of the Social Security Administration Regulations (the
"Regulations"). (*Id.* at 57.) *See also* 20 C.F.R.
§ 404.969(b)(2). On June 15, 2007, the Appeals Council remanded
the case to ALJ Strauss and ordered that the ALJ obtain
additional evidence from plaintiff's treating physicians, give
further consideration to the treating physicians' opinions,
obtain evidence from an internist, and, if warranted, obtain
evidence from a vocational expert. (*Id.* at 57-58, 102.)

ALJ Strauss sought additional information from Drs.
Kaplan and Lippman, and also requested information from
plaintiff's physician Dr. Robert Farron. (*See id.* at 205-07.)
On August 7, 2008 and October 14, 2008, ALJ Strauss held further
hearings on plaintiff's SSD claims. (*Id.* at 104, 126.) At the
August 7, 2008 hearing, ALJ Strauss sought the opinion of Dr.
Gussoff, an internist. (*See id.* at 682.) At the October 14,
2008 hearing, ALJ Strauss sought the opinion of an orthopedic
surgeon, Dr. Spindell. (*See id.* at 632.) On June 25, 2009,

after *de novo* review, ALJ Strauss issued a decision pursuant to the five-step sequential evaluation process for determining whether an individual is disabled under the Act. (*See id.* at 24-35.) *See* 20 C.F.R. § 404.1520(a)(4) (setting forth the five-step sequential evaluation process).

According to ALJ Strauss, under step one, plaintiff had not engaged in substantial gainful activity during the period from her amended alleged onset date of August 17, 2002 through the date last insured of March 31, 2003. (Tr. at 27.) Under step two, the ALJ found that plaintiff's severe impairments included lumbar disc disease, cervical disc disease and fibromyalgia.[13] (*Id.*) ALJ Strauss also found under step two that there was no evidence to establish medically determinable impairments in her left shoulder or left hip, and plaintiff's headaches were not persistent enough to qualify as a severe impairment. (*Id.*) Under step three, ALJ Strauss found that plaintiff's impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[14] (*Id.*) Additionally, ALJ Strauss reasoned that the testimony of Dr. Gussoff, stating that plaintiff had an impairment equal to Medical Listing 1.04A, was not credible and

---

[13] *See* 20 C.F.R. § 404.1520(c).

[14] *See* 20 C.F.R. § 404.1520(d)-(e).

not supported by the medical record. (*Id.*)  Next, ALJ Strauss

opined that:

> [T]hrough the last date insured, the claimant had the
> residual function capacity to perform light work or
> work that involved lifting 20 pounds occasionally, 10
> pounds frequently, sitting 6 hours out of an 8 hour
> workday, standing and walking 6 hours out of an 8 hour
> workday with normal and usual breaks.

(*Id.*)  In making this finding, ALJ Strauss considered opinion

evidence and the credibility of plaintiff's statements about her

symptoms.[15]  (*Id.* at 28.)  ALJ Strauss opined that because of

inconsistencies in the findings of both Dr. Kaplan and Dr.

Lippman, their opinions were not entitled to controlling or

significant weight.  (*Id.* at 33.)  ALJ Strauss also determined

that the expert testimony of Dr. Spindell, and not Dr. Gussoff,

should be given significant weight because Dr. Spindell had

"more appropriate medical expertise . . . and fully explained

his conclusions by citing to the record."  (*Id.* at 31.)

Additionally, ALJ Strauss found that plaintiff's statements were

inconsistent with the residual functional capacity assessment of

Dr. Spindell.  (*Id.* at 33.)  Under step four, ALJ Strauss

determined that plaintiff was "capable of performing past

relevant work as a hand packer."  (*Id.* at 34.)  The ALJ also

proceeded to step five and concluded that plaintiff could

perform other jobs in the national economy.  (*Id.* at 34-35.)

---

[15] *See* 20 C.F.R §§ 404.1527, 404.1529.

Based on this analysis, ALJ Strauss found that plaintiff "was not under a disability, as defined in the Social Security Act," during the time between the alleged onset date and the date last insured. (*Id.* at 35.)

On May 26, 2010, ALJ Strauss's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (*Id.* at 6.) Proceeding with counsel, plaintiff filed the instant Complaint on July 19, 2010, alleging that she is entitled to receive SSD benefits because she suffers from "osteoarthritis, migraines, cervical and lumbar radiculopathies and fibromyalgia," which impairments plaintiff alleges have rendered her disabled and prevented her from engaging in any work since August 17, 2002. (*See* ECF No. 1, Compl. ¶¶ 4-5.) In her Complaint, plaintiff alleges that the ALJ's decision is "erroneous . . . and not supported by substantial evidence." (*Id.* ¶ 17.)

**DISCUSSION**

## I. Legal Standards

### A. The Substantial Evidence Standard

The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court does not

review the Commissioner's decision *de novo* to determine whether a claimant is disabled. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). Instead, in reviewing the final decision of the Commissioner, a district court's inquiry is limited to the question of whether the correct legal standards were applied and whether substantial evidence supports the decision. *Id.* "A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether substantial evidence supports the findings of the ALJ on appeal, the court will consider "the whole record, examining the evidence from both sides." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). This includes "contradictory evidence and evidence from which conflicting inferences can be drawn." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). Finally, the district court "may not substitute its own judgment for that of the [ALJ], even if it might justifiably

have reached a different result upon a *de novo* review." *Jones*

*v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v.*

*Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.

1984)).

**B. The Commissioner's Five-Step Analysis of Disability Claims**

A claimant must be "under a disability," as defined by

the Social Security Act, in order to receive disability

benefits. 42 U.S.C. § 423(a)(1)(E). A claimant can establish

disability by demonstrating an "inability to engage in any

substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." *Id.*

§ 423(d)(1)(A). The impairment must be "of such a severity"

that the claimant is "not only unable to do [his or her]

previous work but cannot, considering [his or her] age,

education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."

*Id.* § 423(d)(2)(A).

The Social Security Administration has promulgated a

five-step sequential analysis requiring the ALJ to find the

claimant disabled if the ALJ determines: "(1) that the claimant

is not working,[16] (2) that he [or she] has a 'severe

impairment,'[17] (3) that the impairment is not one that is [listed

in Appendix 1 of the Regulations] that conclusively requires a

determination of disability,[18] . . . (4) that the claimant is not

capable of continuing in his [or her] prior type of work,[19] . . .

[and] (5) there is not another type of work that claimant can

do."[20]  *Scott v. Astrue*, No. 09-CV-3999, 2010 WL 2736879, at *8

(E.D.N.Y. July 9, 2010) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008)); *see also* 20 C.F.R. § 404.1520(a)(4).  If

after step three the ALJ has found that the claimant's

"impairment(s) does not meet or equal a listed impairment," the

ALJ will "make a finding about [claimant's] residual functional

capacity" ("RFC").  20 C.F.R. § 404.1520(e).  The RFC is used at

both the fourth and fifth steps of the sequential evaluation.

*Id.*

---

[16] Under the first step, if the claimant is working and the work he or she is doing is "substantial gainful activity," then the claimant is not disabled regardless of other findings.  20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).

[17] Under the second step, the claimant must have an "impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic activities" in order to be classified as severe.  20 C.F.R. § 404.1520(c); *see also id.* § 404.1520(a)(4)(ii).

[18] Under the third step, if the claimant has an impairment that "meets the duration requirement and is listed in appendix 1, or is equal to a listed impairment(s)," the claimant will be found disabled.  20 C.F.R. § 404.1520(d); *see also id.* § 404.1520(a)(4)(iii).

[19] Under the fourth step, the claimant's "impairment(s) must prevent [him or her] from doing [his or her] past relevant work" to be found disabled.  20 C.F.R. § 404.1520(f); *see also id.* § 404.1520(a)(4)(iv).

[20]  Under the fifth step, the claimant's "impairment(s) must prevent [him or her] from making an adjustment to any other work" that is available in the national economy in order to be found disabled.  20 C.F.R. § 404.1520(g); *see also id.* § 404.1520(a)(4)(v).

At steps one through four of the five-step analysis, the claimant bears the "general burden of proving that he or she has a disability within the meaning of the Act." *Burgess*, 537 F.3d at 128 (citations omitted). At the fifth step of the sequential evaluation process, the burden shifts from the claimant to the Commissioner "to prove that the claimant, if unable to perform her past relevant work, is able to engage in gainful employment within the national economy." *Soboloweski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

## II. Application

### A. The ALJ Properly Determined That Plaintiff's Spinal Impairment Did Not Meet or Equal Medical Listing 1.04A.

Plaintiff contends that the ALJ's conclusion that plaintiff's spinal impairment did not meet or equal Medical Listing 1.04A was based on numerous errors.

#### 1. The ALJ did not err in holding a supplementary hearing and having an additional medical expert testify.

Plaintiff argues that ALJ Strauss erred by obtaining the testimony of a second medical expert, Dr. Spindell, at a supplemental hearing held on October 14, 2008. (*See* ECF No. 13, Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated 12/16/2010 ("Pl. Mem.") at 19-20.) Specifically, plaintiff argues that because Dr. Gussoff's testimony was "uncontradicted" and, prior to Dr. Spindell's

testimony, "the record was unanimous and unambiguous," the "most obvious explanation" as to why ALJ Strauss sought Dr. Spindell's testimony was to "actively seek[] a basis to deny Plaintiff['s] claim." (*Id.* at 19.) Additionally, plaintiff argues that in seeking Dr. Spindell's testimony, ALJ Strauss violated the Social Security Administration's own internal operating guide, the Manual on the Social Security Administration Hearings, Appeals, and Litigation Law ("HALLEX"). (*Id.*) Finally, plaintiff argues that ALJ Strauss obtained Dr. Spindell's testimony against the order of the Appeals Council. (*Id.*)

In response, the Commissioner argues that ALJ Strauss was justified in holding a supplementary hearing and having Dr. Spindell testify because "further medical expert testimony" was needed to adjudicate the case. (*See* ECF No. 15, Memorandum of Law in Support of the Defendant's Cross-Motion for Judgment on the Pleadings, dated 1/31/2011 ("Def. Mem.") at 23.) The Commissioner contends that Dr. Gussoff was unclear in his discussion of the evidence and "unable to explain the basis for his opinion," and therefore Dr. Spindell's testimony was needed to clarify "the central issue in the case: plaintiff's spine impairment." (*Id.*)

The Regulations governing proceedings relating to disability claims clearly permit an ALJ to consider the opinion of more than one medical expert. *See* 20 C.F.R. § 404.1526(4)(c)

("When we determine if your impairment medically equals a listing, we consider . . . the opinion given by one or more medical or psychological consultants designated by the Commissioner."). Additionally, HALLEX section I-2-5-34 provides that an ALJ may need to obtain medical expert testimony:

> (1) when the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s); or (2) when the medical evidence is conflicting or confusing; or (3) when the ALJ desires expert medical opinion regarding the onset of an impairment.

HALLEX § I-2-5-34(A) (Sept. 28, 2005). Plaintiff argues that HALLEX section I-2-5-45, entitled "Action When ALJ Receives New Evidence After a Medical Expert Has Provided an Opinion" is controlling here. (*See* ECF No. 13, Pl. Mem. at 19.) By its own terms, however, HALLEX section I-2-5-45 applies only when an ALJ has received new evidence after a medical expert has already testified. *See* HALLEX § I-2-5-45 (Sept. 28, 2005). As no new evidence was introduced after Dr. Gussoff testified, HALLEX section I-2-5-45 is inapplicable here.[21]

---

[21] In addition, courts in the Eastern District of New York have held that "a failure to follow procedures outlined in HALLEX does not constitute legal error." *Grosse v. Comm'r of Soc. Sec.*, No. 08-CV-4137, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (citation omitted); *see also Harper v. Comm'r of Soc. Sec.*, No. 08-CV-3803, 2010 WL 5477758, at *4 (E.D.N.Y. Dec. 30, 2010). Although the Second Circuit has not decided the issue, "other circuits have held that 'HALLEX' has no legal force and is not binding." *Peck v. Astrue*, No. 07-CV-3762, 2010 WL 3125950, at *10 (E.D.N.Y. Aug. 6, 2010) (citing *Bunnell v. Barnhart*, 336 F.3d 1112, 1115 (9th Cir. 2003)). *But see Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (noting that although the HALLEX does not "carry the authority of law," agencies should follow their own

The Regulations also provide that the ALJ "may take additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). In its September 9, 2005 order, the Appeals Council instructed ALJ Strauss to "[g]ive further consideration to the treating source opinions . . . [and] [o]btain evidence from a medical expert (internist) to clarify the nature and severity of the claimant's impairments." (Tr. at 57.) After complying with this order by holding an initial hearing with Dr. Gussoff, a board certified internist, ALJ Strauss determined that "it [was] necessary [to hold] another supplemental hearing." (*Id.* at 25.) In particular, ALJ Strauss believed "it was more appropriate to schedule a second hearing to have an orthopedic specialist testify" because the medical records at issue related to plaintiff's orthopedic impairments. (*Id.* at 25, 214.)

Here, ALJ Strauss's decision to seek and consider Dr. Spindell's testimony was "not inconsistent with the Appeals Council's remand order," as she did initially have an internist testify. *See* 20 C.F.R. § 404.977(b). Additionally, plaintiff has failed to cite to any case law, and the court has found no

procedures even when they are "more rigorous than otherwise would be required." (quoting *Hall v. Schweiker*, 660 F.2d 116, 199 (5th Cir. 1981))).

authority, to suggest that the ALJ may not introduce an
additional medical expert to testify at a supplemental hearing.
To the contrary, in *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 693
(S.D.N.Y. 2001), for example, neither party nor the district
court raised as a possible basis for remand the fact that the
ALJ held a supplementary hearing at which a second medical
expert testified.  Accordingly, the court finds that ALJ Strauss
did not err in holding a supplementary hearing or seeking the
testimony of Dr. Spindell.

> **2. The ALJ's finding that plaintiff did not equal
> Medical Listing 1.04A was supported by
> substantial evidence in the record.**

Next, plaintiff contends that ALJ Strauss erred by
concluding that plaintiff's impairments did not "equal" the
spine disorder impairment in Medical Listing 1.04A because her
findings were not supported by substantial evidence in the
record and she did not offer good reasons for her conclusion.
(ECF No. 13, Pl. Mem. at 18.)  The court disagrees and finds
that the ALJ's decision was supported by substantial evidence.

At step three of the sequential analysis, the ALJ must
determine whether a claimant has an impairment that "meets or
equals" one of the Medical Listings in Appendix 1 of Part 404,
Subpart P of the Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).
As relevant here, Medical Listing 1.04A, provides as follows:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test[22] (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04A. "Thus, in order to satisfy this listing, plaintiff must establish that (1) she has a disorder of the spine which compromises a nerve root or the spinal cord, and (2) that this disorder is manifested by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *McKinney v. Astrue*, No. 05-CV-174, 2008 WL 312758, at *4 (N.D.N.Y. Feb. 1, 2008).

Even if a claimant's impairment does not meet the specific criteria of a Medical Listing, it still may equal the Listing. 20 C.F.R. § 404.1526(a). The Commissioner will find

---

[22] "The straight leg test ("SLR") is used to detect nerve root pressure, tension or irritation. A positive SLR requires the reproduction of pain at an elevation of less than 60 degrees. A positive SLR is said to be the most important indication of nerve root pressure." *Mattison v. Astrue*, No. 07-CV-1042, 2009 WL 3839398, at *4 n.10 (N.D.N.Y. Nov. 16, 2009) (citing Andersson & McNeill, Lumbar Spine Syndromes 78-79 (Springer-Verlag Wein 1989)).

that a claimant's impairment is medically equivalent to a
Medical Listing if: (1) the claimant has other findings that are
related to his or her impairment that are equal in medical
severity; (2) the claimant has a "closely analogous" impairment
that is "of equal medical significance to those of a listed
impairment;" or (3) the claimant has a combination of
impairments that are medically equivalent. *Id.*
§ 404.1526(b)(1)-(3). "For a claimant to qualify for benefits
by showing that his unlisted impairment, or combination of
impairments, is 'equivalent' to a listed impairment, he must
present medical findings equal in severity to all the criteria
for the one most similar listed impairment." *Sullivan v.
Zebley*, 493 U.S. 521, 531 (1990); *see also* 20 C.F.R.
§ 404.1526(a) ("[A claimant's] impairment(s) is medically
equivalent to a listed impairment in appendix 1 if it is at
least equal in severity and duration to the criteria of any
listed impairment."). Further, the medical reports must
indicate physical limitations based upon actual observations
and/or clinical tests, rather than the claimant's subjective
complaints. 20 C.F.R. Part 404, Subpart P, Appendix 1
§ 1.00(D). In evaluating whether an impairment is equivalent to
a Medical Listing, the ALJ "will consider all of the evidence in
the record, except for factors of age, education and work

experience." *Lamond v. Astrue*, No. 5:06-CV-0838, 2010 WL 3023901, at *5 (N.D.N.Y. Aug. 2, 2010); 20 C.F.R. § 404.1526(c).

Here, the ALJ found, based on substantial evidence and correct legal principles, that plaintiff's impairments did not meet or equal a listed impairment during the insured period.[23] (*See* Tr. at 30-31); *see also Lamond*, 2010 WL 3023901, at *6 (upholding ALJ's decision that plaintiff's impairment did not meet or equal a listed impairment because it was supported by substantial evidence and correct legal principles). In reaching this conclusion, ALJ Strauss relied on the testimony of Dr. Spindell, rather than that of Dr. Gussoff. (*See* Tr. at 31.) Although ALJ Strauss noted that "Dr. Gussoff opined the claimant's impairments equaled section 1.04A of the Listings of Impairments," (*id*. at 30), the ALJ explained that Dr. Spindell "ha[d] more appropriate expertise as . . . a board certified orthopedist," (*id*.). Dr. Gussoff, on the other hand, was a "board certified in hematology/oncology and internal medicine," an area not specific to plaintiff's claimed impairments. (*Id.* at 30; *see also id.* at 624.) Additionally, ALJ Strauss relied on Dr. Spindell's testimony because she found that Dr. Gussoff's opinion was neither credible nor supported by the medical evidence in the record. (*Id.* at 27, 30-31.) Further, contrary

---

[23] The parties agree that plaintiff's impairments did not meet Listing 1.04A. (*See* ECF No. 13, Pl. Mem. 18; ECF No. 15, Def. Mem. at 20.)

to plaintiff's assertion that ALJ Strauss failed to obtain any testimony from Dr. Spindell regarding why plaintiff did not equal Listing 1.04A, (*see* ECF No. 13, Pl. Mem. at 18), the court notes that ALJ Strauss did, in fact, ask Dr. Spindell whether plaintiff "met listing level severity or equaled listing level severity" during the relevant time period, (Tr. at 641). Dr. Spindell responded that plaintiff did not meet or equal the listing, adding that "there was nothing that showed an acute neurological deficit involving motor strength and . . . there were no neurological deficits . . . and the findings showed no gross deformity." (*Id.* at 641-42.) Thus, Dr. Spindell's testimony was not limited to whether plaintiff *met* Medical Listing 1.04A, but also touched on whether plaintiff *equaled* the Listing, and the ALJ appropriately relied on his testimony in concluding that the Listing was not equaled.

The medical evidence in the record further supports ALJ Strauss's finding that plaintiff's spinal impairment did not equal Medical Listing 1.04A between August 17, 2002 and March 31, 2003, the date last insured. Although there is evidence of compromise of a nerve root and some limitation of motion of plaintiff's spine, substantial evidence supports the ALJ's finding that plaintiff's impairments or combination of impairments did not satisfy the remaining necessary criteria.

An MRI of plaintiff's lumbosacral spine performed on June 9, 2000, nearly two years prior to the relevant time period, showed disc degeneration, bulging, and herniation encroaching on the right neural foramen with impression on the thecal sac.  (*Id.* at 328.)  Similarly, an x-ray of plaintiff's cervical spine in December 2002 revealed slight disc degeneration.  (*Id.* at 391.)  These changes, along with plaintiff's repeated complaints of "radiating" pain down her left arm and leg, (*id.* at 389-91, 496), appear to constitute "evidence of nerve root compression characterized by neuro-anatomic distribution of pain."  *See Davis v. Astrue*, No. 6:09-CV-186, 2010 WL 2545961, at *4-5 (N.D.N.Y. June 3, 2010) (remanding for further explanation by ALJ as to why plaintiff did not meet Medical Listing 1.04A where MRI revealed disc herniation in close proximity to nerve root sheaths and degenerative disc change with complaints of radiating pain).  On the other hand, the June 2000 MRI also showed that the cauda equina was "normal in position and appearance."  (Tr. at 328.)  Further, as Dr. Spindell testified, because the disc encroachment found on plaintiff's right side would not cause plaintiff's pain on her left side, the MRI results were less significant.  (*Id.* at 636-37, 645.)

With respect to the second element of Medical Listing 1.04A, limitation of motion of the spine, the medical evidence

is even less supportive of plaintiff's claim.  In a March 10, 2000 physical examination, Dr. Lippman found that plaintiff had "full range of motion of the hips, knees and ankles," did not have pain with extension, and was able to heel walk and toe walk easily.  (*Id.* at 285.)[24]  On December 16, 2002, which was two and a half years later and during the relevant time period, Dr. Lippman noted that plaintiff had reduced cervical range of motion, although she was still able to heel-toe walk and her flexion was "ok."  (*Id.* at 347-48, 389.)  During a visit with Dr. Kaplan on April 2, 2003, plaintiff's neck rotation was limited to 80 degrees bilaterally.  (*Id.* at 392.)  Dr. David Steiner, a neurologist, examined plaintiff on January 13, 2005, nearly two years after the date last insured, and found that she had decreased range of motion in her cervical spine.  (*Id.* at 500.)  In March 2005, however, Dr. Lippman found that while plaintiff had some limitation in rightward rotation, her leftward rotation, flexion, and extension were normal and she had full range of motion in her upper extremities.  (*Id.* at 496.)

The third requirement of Medical Listing 1.04A is "motor loss (atrophy with associated muscle weakness or muscle

---

[24] The court notes that ALJ Strauss incorrectly attributed the March 2000 examination report to Dr. Kaplan.  (*See* Tr. at 32.)  In fact, Dr. Lippman examined plaintiff and wrote a letter to Dr. Kaplan summarizing his findings. (*See id.* at 285.)

weakness) accompanied by sensory or reflex loss." According to the medical records, plaintiff did not suffer from significant motor or sensory loss or atrophy before or during the insured period, or even up to two and a half years thereafter, thus weighing against a finding of equivalence. In March 2000, Dr. Lippman found that plaintiff had "[s]trength [of] 5/5 in all major muscle groups" and her sensation was intact. (*Id.* at 285.) Similarly, a physical examination on January 4, 2005 showed no atrophy or weakness and motor and sensory nerve studies were "normal for latency, amplitude and nerve conduction velocity." (*Id.* at 387, 384.) Although an EMG study performed on the same date showed some sensory defect, as Dr. Spindell explained, the defect "correlated only to the left first digit, not to the hand." (*Id.* at 506, 639-40.) Moreover, on January 13, 2005, Dr. Steiner assessed plaintiff's motor strength as "grossly 5/5," except for her left elbow and shoulder, which were 4+/5. (*Id.* at 501.) Dr. Steiner further found that plaintiff had "normal tone and no atrophy." (*Id.*) In March 2005, plaintiff complained of weakness to Dr. Lippman, but he found that her strength was 5/5 in all major muscle groups, her sensation was intact, her reflexes were 2+ and symmetric, and her tone, coordination, gait, and balance were normal. (*Id.* at 496.) Although in October 2007, more than four years after the insured period in question, Dr. Zaretsky found that plaintiff's

cervical and lumbosacral range of motion was severely limited
and her left calf had atrophied (*id.* at 426), "[e]vidence of an
impairment that reached disabling severity after the expiration
of an individual's insured status cannot be the basis for a
disability determination, even though the impairment itself may
have existed before the individual's insured status expired."
*Mattison v. Astrue*, No. 07-CV-1042, 2009 WL 3839398, at *5
(N.D.N.Y. Nov. 16, 2009). Lastly, the record reveals no
instance during which plaintiff exhibited positive straight leg
raising. (*See* Tr. at 285, 426.)

        Although ALJ Strauss could have been more explicit in
her reasoning with respect to plaintiff's failure to equal
Medical Listing 1.04A, this court may, and has, "look[ed] to
other portions of the ALJ's decision and to clearly credible
evidence" in the record supporting the ALJ's conclusion.
*Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112-13 (2d.
Cir. 2010) (holding that there is no need to remand for
clarification if this is not a case "in which we would be unable
to fathom the ALJ's rationale in relation to evidence in the
record"). Thus, in light of the aforementioned evidence, the
court finds that ALJ Strauss's conclusion that plaintiff did not
have an impairment or combination of impairments that medically
equaled Medical Listing 1.04A was in accord with substantial
evidence in the record and remand is not warranted.

**B. The Treating Physician Rule**

Plaintiff asserts that ALJ Strauss erred by failing to assign her treating physicians' opinions controlling weight. Pursuant to the Regulations, a treating source is "your own physician . . . or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502; *see also Sokol v. Astrue*, No. 05-CV-6631, 2008 WL 4899545, at *12 (S.D.N.Y. 2008) (quoting *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988)). The Regulations also provide that the medical opinion of a treating physician "on the issue(s) of the nature and severity of [the] impairment(s)" will be given controlling weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *see also Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 343 (E.D.N.Y. 2010)). Further, "a treating physician's retrospective opinion is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Clobridge v. Astrue*, 5:07-CV-691, 2010 WL 3909500, at *7 (N.D.N.Y. Sept. 30, 2010) (quoting *Rivera v. Sullivan*, 923 F.2d 964, 968-69 (2d Cir. 1991)). The opinions of treating physicians are given

controlling weight because "these sources are likely to be the
medical professionals most able to provide a detailed,
longitudinal picture of [the] medical impairment(s) and may
bring a unique perspective to the medical evidence that cannot
be obtained from the objective medical evidence alone or from
reports of individual examinations."  20 C.F.R.
§ 404.1527(d)(2).

On the other hand, in situations where "the treating
physician issued opinions that [were] not consistent with other
substantial evidence in the record, such as the opinions of
other medical experts," the treating physician's opinion "is not
afforded controlling weight."  *Halloran v. Barnhart*, 362 F.3d
28, 32 (2d Cir. 2004); *see also Snell v. Apfel*, 177 F.3d 128,
133 (2d Cir. 1999) ("When other substantial evidence in the
record conflicts with the treating physician's opinion . . .
that opinion will not be deemed controlling.").  Additionally,
findings that "a claimant is disabled and cannot work . . . are
reserved to the Commissioner," and a treating physician's
opinion on these points is not afforded controlling weight.  *Id.*
at 133 (internal citations omitted); *see also* 20 C.F.R.
§ 404.1527(e)(1).  Thus, the ALJ "considers the data that
physicians provide but draws [his or her] own conclusions as to
whether those data indicate disability."  *Snell*, 177 F.3d at
133.  Nonetheless, an ALJ "cannot reject a treating physician's

diagnosis without first attempting to fill any clear gaps in the administrative record." *Scott*, 2010 WL 2736879, at \*9 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*.").

When controlling weight is not given to a treating physician's opinion, the Regulations require the ALJ to "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33; *see also Jeffcoat v. Astrue*, No. 09-CV-5276, 2010 WL 3154344, at \*14 (E.D.N.Y. Aug. 6, 2010) (remanding because the ALJ failed to comprehensively set forth his reasons for the weight assigned to the treating physician's opinions because he failed to state what weight he accorded to the opinion or to consider the guiding factors); 20 C.F.R. § 404.1527(d)(2) (the Commissioner "will *always give good reasons* in [its] notice of determination or decision for the weight [given to a] treating source's opinion") (emphasis added).

Courts have not "hesitate[d] to remand [cases] when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion." *Halloran*, 362 F.3d at 33. Additionally, the court should "continue remanding when

[it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Id.* The Regulations set forth the following factors that ALJs must apply to determine how much weight should be given to a treating physician's opinion: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* at 32 (citing 20 C.F.R. § 404.1527(d)).

The court reviews the treating physicians' findings as follows:

### 1. Stuart D. Kaplan, M.D.

In a letter dated June 1, 2005 to plaintiff's counsel, Dr. Kaplan stated that he had treated plaintiff since 1999 for "multiple rheumatologic problems including osteoarthritis, lumbosacral and cervical radiculopathies, carpal tunnel syndrome and fibromyalgia syndrome." (Tr. at 393.) The doctor further stated that plaintiff "suffers from chronic severe pain in . . . her neck, back, arms and legs . . . [and] [s]he also suffers from numbness in her hands." (*Id.*) Dr. Kaplan concluded that

plaintiff would be "unable to perform any activities requiring
prolonged standing, walking, sitting or repetitive use of her
arms or hands" and that she was "totally disabled and not
capable of engaging in any meaningful employment." (*Id.* at 393-
94.) On June 2, 2005, Dr. Kaplan also filled out a multiple
impairments questionnaire, making specific findings about
plaintiff's impairments and inability to work. (*See id.* at 395-
402.)

In her decision denying plaintiff's application for
SSD, ALJ Strauss acknowledged Dr. Kaplan's opinion regarding
plaintiff's physical limitations and the doctor's assessment
that plaintiff was "totally disabled," but found that Dr.
Kaplan's opinion was not entitled to controlling or significant
weight. (*Id.* at 32-33.) Although ALJ Strauss considered many
of the relevant factors identified in the Regulations, remand is
nevertheless appropriate because she failed to support her
decision with good reasons based on medical evidence in the
record.

ALJ Strauss assessed the length and frequency of
plaintiff's treatment, and the nature and extent of plaintiff's
treating relationship with Dr. Kaplan. Noting that Dr. Kaplan
"saw the claimant twice in 1999, three times in 2000, once in
2001, 2002 and 2003, twice in 2004 and 2005 and once in 2006,"
the ALJ concluded that "[Dr. Kaplan] did not treat her

regularly." (*Id.* at 32.) ALJ Strauss also considered and found
that Dr. Kaplan's opinion about certain impairments was neither
supported by, nor consistent with, the medical record.[25] For
example, the ALJ's decision indicated that although "Dr.
Kaplan's notes show tender points on various dates, he rarely
makes positive range of motion findings, particularly of the
lumbosacral and cervical spine." (*Id.*) The ALJ also noted that
Dr. Kaplan's "treatment notes do not show persistent complaints
of pain radiating from the neck to the arm or inability to use
hand/fingers in the period at issue." (*Id.*) In addition, ALJ
Strauss found that although the June 2, 2005 multiple
impairments questionnaire "states symptoms and limitations apply
since June 1999 . . . the records do not establish carpal tunnel
syndrome, of which Dr. Kaplan says [plaintiff] has symptoms."
(*Id.*) Indeed, ALJ Strauss noted, an EMG study of plaintiff's
upper extremities performed as late as January 2005 did not find
carpal tunnel syndrome. (*Id.*) ALJ Strauss also stated that the
first time fibromyalgia was diagnosed was in June 2005, further

---

[25] The court notes that in ALJ Strauss's justification for discounting the
opinion of Dr. Kaplan, the ALJ erroneously referred to a March 2000 report
that was actually prepared by Dr. Lippman. Specifically, the ALJ's decision
stated that "[o]n March 2000 Dr. Kaplan reports the claimant was complaining
of pain, but no stiffness, paresthesia or weakness. On physical examination
[Dr. Kaplan] reports spasm of the lumbosacral spine, but straight leg raising
was negative and there was pain with flexion but claimant was able to heel-
toe walk." (Tr. at 32.) The report referred to is a letter dated March 10,
2000 from Dr. Lippman to Dr. Kaplan. (*See id.* at 285.) Although Dr.
Lippman's physical examination notes, referred to by ALJ Strauss, cannot be
the basis for discounting Dr. Kaplan's opinion, the court will consider these
notes in its analysis of Dr. Lippman's opinion below.

suggesting that Dr. Kaplan's opinion as to plaintiff's longstanding condition of fibromyalgia was unsupported. (*Id.*) Moreover, ALJ Strauss found Dr. Kaplan's opinion of plaintiff's severe impairments inconsistent with the conservative treatment he had prescribed over a period of six years. (*Id.*)

ALJ Strauss found that the extreme limitations Dr. Kaplan ascribed to plaintiff on the questionnaire would mean that plaintiff was bedridden and thus were inconsistent with plaintiff's testimony of her daily activities. (*Id.*) The ALJ further stated, "Dr. Kaplan's limitations do not mathematically add up if the claimant could not sit continuously and had to get up every ½ hour and move around for 10 minutes before she could sit again." (*Id.*) ALJ Strauss also noted that some of the doctor's answers on the questionnaire were "totally speculative, without attribution to objective findings in the record." (*Id.*)

The court finds that the reasons given by ALJ Strauss are inadequate to support the ALJ's decision to discount Dr. Kaplan's testimony. First, the court finds that the frequency of Dr. Kaplan's treatment of plaintiff weighs in favor, and not against, reliance on Dr. Kaplan's opinion. Although plaintiff saw Dr. Kaplan only once during the relevant time period, he treated her over the course of several years, including immediately before and after the relevant time period. There is thus no question that Dr. Kaplan was plaintiff's treating

physician throughout the relevant time period. *See Schisler*, 851 F.2d at 46 (defining a treating physician as "a claimant's . . . own physician . . . who has provided the [claimant] with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual."); *see also* 20 C.F.R. § 404.1502. *Cf. Arnone v. Bowen*, 882 F.2d 34, 41 (2d Cir. 1989) (finding that where the claimant's claim depended on showing continuous disability from 1977-1980, a doctor who treated him several times in 1974 and 1975, and once in 1987, was not a "treating physician" within the meaning of the rule, because "there simply was no ongoing physician-treatment relationship between" the claimant and the doctor during the relevant period and the doctor was therefore "not in a unique position to make a complete and accurate diagnosis") (internal quotations and citations omitted).

In addition, an ALJ may not discount the opinion of a treating physician "merely because he has recommended a conservative treatment regimen." *Burgess*, 537 F.3d at 129; *see also Shaw*, 221 F.3d at 134 (ruling that "the district court improperly characterized the fact that [the treating physician] recommended only conservative [treatment] as substantial evidence that plaintiff was not physically disabled during the relevant period"). Further, the fact that a claimant performs daily activities cannot controvert medical evidence that she is

disabled.  (*See* ECF No. 13, Pl. Mem. at 21-22.)  *See e.g.,*
*Murdaugh v. Sec'y of Dep't of Health & Human Servs.*, 837 F.2d
99, 102 (2d Cir. 1988) ("[T]hat appellant receives conservative
treatment, waters his landlady's garden, occasionally visits
friends and is able to get on and off an examination table can
scarcely be said to controvert the medical evidence").  Indeed,
it is well-settled that the performance of basic daily
activities does not necessarily contradict allegations of
disability, "as people should not be penalized for enduring the
pain of their disability in order to care for themselves."
*Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); *see*
*also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("We have
stated on numerous occasions that 'a claimant need not be an
invalid to be found disabled' under the Social Security Act."
(quoting *Williams*, 859 F.2d at 260)).

Finally, although ALJ Strauss stated that fibromyalgia
was not diagnosed until June 2005, the court finds that the
medical records demonstrate otherwise.  Indeed, Dr. Kaplan's
treatment notes reflect a diagnosis of fibromyalgia on October
18, 2000, July 16, 2001, and April 2, 2003.  (*See* Tr. at 392,
439, 444, 448.)

Accordingly, because ALJ Strauss's reasoning in
support of her decision not to afford controlling or significant

weight to Dr. Kaplan's opinion was flawed and insufficient, remand is appropriate.

### 2. Eric S. Lippman, M.D.

ALJ Strauss also declined to assign Dr. Lippman's opinion controlling or significant weight. (*Id.* at 33.) However, because ALJ Strauss failed to identify good reasons for doing so, remand is required.

As noted, an ALJ must provide good reasons for refusing to assign controlling weight to a treating physician's opinion. *See* 20 C.F.R. § 404.1527(d)(2). Good reasons include those listed in the Regulations at 20 C.F.R. § 404.1527(d)(2)-(6). Additionally, as mentioned above, performing routine daily activities cannot alone controvert medical evidence that an individual is disabled. *Murdaugh*, 837 F.2d at 102.

ALJ Strauss's decision to disregard Dr. Lippman's opinion was based entirely on plaintiff's ability to perform daily activities and failed to discuss any of the factors mentioned in the Regulations. Specifically, ALJ Strauss found that Dr. Lippman's analysis was "inconsistent with claimant's own testimony that she cooks, cleans the house, walks to the store and walks her daughter 10 blocks to school" as well as plaintiff's testimony "that she has no problem with personal care, engages in social activities with her family, attends church weekly, and cleans her house." (Tr. at 33.)

Additionally, ALJ Strauss noted that Dr. Lippman's opinion that
"claimant's pain was limiting her ability to perform activities
of daily living and work," was not entitled to weight because
such issues are "reserved to the Commissioner." (*Id.*) ALJ
Strauss thus concluded that "whatever limitation [plaintiff] may
have had, the record does not show her limitations prevent her
from performing basic work activities." (*Id.*)

As noted above, in her discussion of Dr. Kaplan's
treatment notes, ALJ Strauss attributed to Dr. Kaplan certain
purportedly inconsistent statements which, in fact, appeared in
Dr. Lippman's report dated March 10, 2000. (*See id.* at 32,
285.) Specifically, the ALJ's decision stated that "[i]n March
2000 Dr. Kaplan reports the claimant was complaining of pain,
but no stiffness, paresthesia or weakness. On physical
examination he reports spasm of the lumbosacral spine, but
straight leg raising was negative and there was pain with
flexion but claimant was able to heel-toe walk." (*Id.* at 32.)
Even when properly attributed to Dr. Lippman, however, any
possible inconsistencies in these notes do not provide
sufficient support for the ALJ's decision not to afford Dr.
Lippman's opinion significant weight. Indeed, the ALJ has
failed to engage in the analysis required by the Regulations to
determine how much weight to give Dr. Lippman's opinion. *See* 20
C.F.R. § 404.1527(d). Where an ALJ has failed to "adequately

explain his reasons . . . for the weight [given] to the [treating physician's] opinion," remand is required. *Scott*, 2010 WL 2736879, at \*17. Accordingly, ALJ Strauss's failure to provide adequate explanations for her decision not to afford Dr. Lippman's opinion controlling or significant weight requires remand.

### 3. Robert Zaretsky, M.D.

Although plaintiff argues that ALJ Strauss erred in assigning no weight to Dr. Zaretzky's opinion, the court finds that ALJ Strauss's decision was adequately supported and this is not a basis for remand.

An ALJ is "free to conclude that the opinion of a [non-treating source] was not entitled to any weight," so long as the ALJ explains that decision. *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2000). The Regulations define a "treating source" as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treating or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. An "ongoing treatment relationship" is a relationship where "the medical evidence establishes that you see, or have seen, the source with a frequency consistent with the accepted medical practice or the type of treatment and/or evaluation required for your medical condition(s)." *Id.* The

Second Circuit has defined a treating physician as "a claimant's

. . . own physician . . . who has provided the [claimant] with

medical treatment or evaluation and who has or had an ongoing

treatment and physician-patient relationship with the

individual." *Schisler*, 851 F.2d at 46.  Further, a physician

who sees a patient only once does not have a chance to develop

an ongoing relationship with the patient and thus is generally

not considered a treating physician.  *See Garcia v. Barnhart*,

No. 01-CV-8300, 2003 WL 68040, at *5 n.4 (S.D.N.Y. Jan. 7,

2003).

ALJ Strauss's decision not to afford controlling

weight to Dr. Zaretsky's opinion was based on numerous factors.

First, as ALJ Strauss noted, Dr. Zaretsky saw plaintiff on only

one occasion, four years after the relevant time period.  (Tr.

at 33.)  Indeed, plaintiff's counsel conceded in the October 14,

2008 hearing before ALJ Strauss that Dr. Zaretsky was "not a

treating physician."  (*Id.* at 659.)  Further, ALJ Strauss found

inconsistencies both within Dr. Zaretsky's testimony and as

compared to the record as a whole.  For example, ALJ Strauss

found that although Dr. Zaretsky "checked off that claimant had

no significant limitations in doing repetitive reaching,

handling, fingering and lifting," this finding was inconsistent

with the doctor's "limitation for lifting 10-15 pounds and also

with his check-offs for significant moderate limitations in

grasping, turning and twisting objects." (*Id.* at 33.)
Furthermore, ALJ Strauss noted that although "claimant was still
working in 1998, [and] did not initially claim to be disabled
until June 1999 . . . [Dr. Zaretsky] states claimant has been
disabled since 1998." (*Id.*)

Accordingly, because Dr. Zaretsky was not a treating
physician, ALJ Strauss was warranted in not assigning his
opinion controlling or significant weight. *See* 20 C.F.R.
§ 404.1527(d). Additionally, ALJ Strauss provided good reasons
for rejecting Dr. Zaretsky's opinion and affording it no weight
at all. *See id.* Thus, the court will not remand based on the
weight assigned to Dr. Zaretsky's opinion.

## C. The ALJ Failed to Properly Evaluate Plaintiff's Credibility.

ALJ Strauss found that plaintiff's "statements
concerning the intensity, persistence and limiting effects of
[her] symptoms are not credible . . . ." (Tr. at 33.) Because
ALJ Strauss failed adequately to assess the credibility of
plaintiff's statements, remand is required.

In determining whether an individual is disabled under
the Act, the ALJ "must determine whether a claimant who has a
severe impairment nonetheless has the 'residual functional
capacity ("RFC")' to perform work available to him." *Genier*,
606 F.3d at 49 (citing 20 C.F.R. §§ 404.1520, 404.1560). The

"subjective element of pain" has been held by the Second Circuit to be an "important factor" in determining disability. *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984) (citing *Ber v. Celebrezze*, 332 F.2d 293, 298, 300 (2d Cir. 1964)). Thus, in addition to "objective medical facts, the ALJ must consider subjective evidence of pain and disability in [his or her] 'severity' analysis." *Temkin v. Astrue*, No. 09-CV-4246, 2011 WL 17523, at *7 (E.D.N.Y. Jan. 4, 2011). The ALJ has the discretion, however, to "evaluate the credibility of a claimant and arrive at an independent judgment, in light of medical findings and other evidence." *Pietrunti v. Dir., Office of Worker's Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (citations omitted).

The Regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At step one, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(a)-(b). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of the record. *Id.* § 404.1529(a).

Social Security Ruling ("S.S.R.") 96-7p sets forth seven factors that an ALJ must consider in determining the credibility of a claimant's statements about his or her symptoms and the effects of his or her impairments:

> (1) The individual's daily activities; (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

S.S.R. 96-7p, 1996 WL 374186, at *3 (July 2, 1996); *see also* 20 C.F.R. § 404.1529(c); *Wright v. Astrue*, No. 06-CV-6014, 2008 WL 620733, at *3 (E.D.N.Y. Mar. 5, 2008). Where the ALJ fails sufficiently to explain a finding that the claimant's testimony was not entirely credible, remand is appropriate. *See, e.g.*, *Tornatore v. Barnhart*, No. 05-CV-6858, 2006 WL 3714649, at *6 (S.D.N.Y. Dec. 12, 2006).

ALJ Strauss's finding that plaintiff's allegations were not credible was based on several observations. First, the ALJ noted that plaintiff "has never been hospitalized for back or neck pain and was treated conservatively." (Tr. at 33.)

Next, she emphasized that plaintiff continued to perform typical daily activities such as personal care, cooking, and attending church weekly. (*Id.* at 34.) Finally, the ALJ stated that the record lacks "quantitative evidence of any significant motor loss with muscle weakness and sensory reflex loss along with appropriate radicular distribution." (*Id.*) Based on these observations, ALJ Strauss concluded, "[t]he objective and clinical findings do not document the presence of impairments which would prevent the claimant from engaging in all work related activities." (*Id.*)

In reaching her conclusion, ALJ Strauss considered some, but not all of the mandatory factors set forth in the Regulations. *See* S.S.R. 96-7p, 1996 WL 374186, at *3; 20 C.F.R. § 404.1529(c). It is clear from the record that ALJ Strauss considered the daily activities as well as the frequency and intensity of plaintiff's pain and symptoms. (*See* Tr. at 33-34.) She also discussed the fact that plaintiff received treatment, "other than medication," in the form of physical therapy. (*See id.* at 28, 32.) ALJ Strauss failed, however, to address what factors, if any, precipitated and aggravated plaintiff's symptoms, including, for example, plaintiff's testimony that walking ten blocks to drop her daughter off at school gave her headaches and made her very tired. (*Id.* at 735.) Similarly, although the ALJ alluded to the fact that plaintiff was

prescribed certain medications and that they caused side effects, (*see id.* at 28, 29, 32), she neglected to describe the type, dosage, and effectiveness of such medication. Finally, ALJ Strauss failed to address additional factors that limited and restricted plaintiff's functionality, such as plaintiff's testimony that she is only able to stand 30 minutes before she feels pain in her hips and knees. (*See id.* at 734.) Because ALJ Strauss failed to address all of the factors set forth in the Regulations, remand is appropriate. *See Wright*, 2008 WL 620733, at *3; *Tornatore*, 2006 WL 3714649, at *6 (remanding because the ALJ considered some, but not all, of the seven factors set forth in Social Security Ruling 96-7p).

### D. Request for New Administrative Law Judge

Plaintiff requests that, if the court remands the case, the court also order the Commissioner to assign a new ALJ to the case. (ECF No. 13, Pl. Mem. at 29.) The decision to reassign a case to a new ALJ is generally left to the Commissioner, and courts will not become involved without a good reason. *See Henry v. Astrue*, No. 07-CV-2769, 2008 WL 2697317, at *9 (E.D.N.Y. Jul. 3, 2008) ("The selection of a new ALJ on remand, however, has been considered to be within the discretion of the Commissioner of the Social Security Administration.") (collecting cases). Courts in this district have held that remand to a new ALJ is appropriate "when the conduct of an ALJ

gives rise to serious concerns about the fundamental fairness of the disability review process." *Brown v. Astrue*, No. CV-08-3653, 2010 WL 2606477, at *9 (E.D.N.Y. June 22, 2010) (quoting *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004)). In determining whether there is good reason, the court should consider the following factors:

> (1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party.

*Sutherland*, 322 F. Supp. 2d at 292. *See, e.g.*, *Falco v. Astrue*, No. CV-07-1432, 2008 WL 4164108, at *8 (E.D.N.Y. Sept. 5, 2008) (remanding case to new ALJ where original ALJ had not fully complied with prior order of the district court); *Taylor v. Astrue*, No. CV-07-3469, 2008 WL 2437770, at *5 (E.D.N.Y. 2008) (directing assignment to new ALJ where original ALJ "twice committed legal error"). Applying these factors in the instant case, the court finds that reassignment to a new ALJ is not warranted. The court presumes that upon remand, the ALJ will apply the appropriate legal standards, as discussed above.

**CONCLUSION**

For the foregoing reasons, the court denies plaintiff's and defendant's cross-motions for judgment on the pleadings and remands this case for further proceedings consistent with this opinion. On remand, the ALJ shall:

(1) Re-examine the opinions of plaintiff's treating physicians, Dr. Stuart D. Kaplan and Dr. Eric S. Lippman, and provide sufficient explanations for the weight afforded to their opinions.

(2) Consider all of the factors required by 20 C.F.R. § 404.1529(c) and S.S.R. 96-7p in determining the credibility of plaintiff's statements regarding her symptoms and the effects of her impairments.

The Clerk of the Court is respectfully requested to close the case.

**SO ORDERED**

Dated:     Brooklyn, New York
           January 23, 2012

_____/s/_____
**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York